[Civ. No. 16080.   First Dist., Div. One.   June 17, 1954.]

Estate of RICHARD O. HANSON, Deceased.   EDNA HANSON et al., Appellants, v. JOSEPH QUINCE et al., Respondents.

L. L. Steele for Appellants.

H. Raymond Hall for Respondents.

PETERS, P. J.—Richard Hanson died intestate and without children on June 18, 1952. Thereafter, his next of kin, referred to herein as the "husband's relatives," filed a petition in the probate proceedings, claiming to be the heirs of Richard entitled to the distribution of his estate. This petition was opposed by contestants, all of whom are the next of kin of Richard's predeceased wife. The administratrix of Richard's estate is included in this group. They will hereafter be referred to as the "wife's relatives." It was their contention that certain portions of Richard's estate had been acquired with community funds during the marriage of Richard and prior to the death of his wife, Edna. If such were the fact, Richard having died intestate and without issue, one-half of such property must be distributed to the wife's relatives under the provisions of section 228 of the Probate Code. The trial court found that two pieces of improved real property and the furnishings therein were acquired with community funds, and ordered one-half of such property distributed to the wife's relatives and one-half to the husband's. This appeal is taken on a settled statement by the husband's relatives from those portions of the judgment awarding one-half of the property in question to the wife's relatives, it being their contention that this property was at all times the separate property of Richard, and that such fact had been so determined in a prior action.

The evidence as to the financial arrangements of the Hansons in general, and in particular as to the source of the funds used to purchase the two pieces of real property and the furnishings, is very meager. It is of such a nature that, if this case is decided on its merits, such evidence will not,

without the aid of inferences and presumptions, support a finding either way on the issue as to whether such funds were the separate property of Richard or the community property of Richard and his predeceased wife. For that reason the parties rely upon and discuss various inferences and presumptions, which are conflicting, overlapping and elusive, and certainly, in this case, far from satisfactory.

The following appears from the record: Early in this century Richard, then unmarried, emigrated from his native Norway to Canada. He acquired a homestead in Saskatchewan. In 1914 he left Canada and took up a federal homestead in Montana, of which he became the owner in 1924. These two properties were, of course, his separate property. In addition, as a soldier with the United States forces in World War I, he received a disabling wound for which he received disability insurance during the balance of his life. From the time these payments started until Richard's death, the government paid him $20,844.75. This, too, was his separate property.

On May 31, 1921, Richard married Edna Joy Doyle in Montana, and shortly thereafter moved to Alameda County, California, where they continued to live together until the death of Edna on July 11, 1931. They had no children, no surviving parents, and Edna died intestate. As already pointed out, Richard died intestate June 18, 1952. He had not remarried. Both worked during the marriage, but the extent of their earnings is not shown. Richard worked to some unknown extent after the death of his wife.

The record shows the following facts in reference to the properties here involved: On September 7, 1922, the Hansons contracted to purchase a vacant lot on 35th Avenue in Oakland. The purchase price was $1,188.50, and $119 was paid as a down payment. The balance was paid in installments. On April 3, 1924, the indebtedness was paid in full, and the Hansons received a deed naming them as owners as tenants in common. It should be mentioned that the record shows that on November 13, 1923, Richard sold his Canadian homestead for $2,850. Whether any portion of these separate funds was used to pay off the debt on the 35th Avenue property does not appear. In 1924 the Hansons constructed a house on this property, and thereafter lived there. They borrowed various sums secured by deeds of trust for this purpose, totaling at one time $2,600. The first loan was secured on April 14, 1924. At the time of Edna's death on

July 11, 1931, this debt had been reduced to $930.05. This loan was paid off by Richard after Edna's death, but the original source of the funds used for such repayments does not appear. Edna had declared a homestead on this property on December 15, 1925. This is one of the pieces of property here involved, found by the trial court to have been acquired with the community funds of Richard and Edna.

The second piece of improved real property here involved is located on Quigley Street, in Oakland. It was purchased by the Hansons on May 7, 1928, for $2,700, $100 being paid down and the balance in small monthly payments. This property was deeded to the Hansons as "joint tenants." From it the Hansons enjoyed some undisclosed income as rent. This property, too, was found by the trial court to have been purchased by the Hansons with community funds.

There are certain other relevant facts that should be mentioned. On June 29, 1929, the Montana homestead was sold for $1,500, the deed being signed by both of the Hansons.

After Edna's death, Richard waived his right to be appointed administrator of her estate, and requested that one Wilmarth by name be appointed, which request was granted. In his petition for letters of administration Wilmarth alleged that the real properties here involved were the community property of Richard and Edna. But in an action brought by Richard against Wilmarth, as administrator, to quiet his title against any claims of Edna's estate, the trial court, in 1934, found that the properties were the separate properties of Richard. This quiet title decree was entered October 22, 1934, the administrator not contesting the action. There is no claim of any fraud practiced by Richard in securing this decree. There is evidence, and the trial court found, that Wilmarth's appointment was secured by Richard, and that Wilmarth was a "friendly Administrator." The application for this appointment was apparently made by Richard's then attorney, who had been Richard's friend and attorney for many years, and who is the attorney for Richard's relatives in this proceeding.

The quiet title decree adjudged that Richard "at all times herein mentioned, was and now is the owner of, in fee simple, and entitled to the immediate possession of" the two pieces of real property, and that Wilmarth, as Edna's administrator "had no estate, right, title, interest, claim, or demand whatsoever in or to the above described real property, or any part or portion thereof." Richard's title was quieted against

all claims of Edna's estate, and Wilmarth, as administrator, was enjoined from bringing any action in respect to Richard's title, or from asserting any "right, title, interest, claim, or demand, whatsoever, in or to said real property adverse" to Richard.

Obviously, the two pieces of real property must have been held by Richard and/or Edna as tenants in common, as community property, as homesteaded property, in joint tenancy, or as the separate properties of either. The quiet title decree determined that they were held as the separate property of Richard. Of course, Edna having died intestate, without issue or parents, even if the properties had been held in tenancy in common, community property, as homesteaded property or in joint tenancy, they would have gone to Richard, by operation of law. But the quiet title decree determined that Edna's estate had no interest at all in these properties and that they were and had been the separate property of Richard. Thus, the quiet title decree, and the judgment in this action are not only inconsistent with, but directly contradictory to each other. This presents the question as to whether the quiet title decree is res judicata and, as such, a bar to the instant case.

The trial court held that it was not. The issue was properly raised. When Richard died these two pieces of real property and their furnishings, were in his estate. These properties have since been sold and cash substituted for them. When the dispute arose between the husband's and the wife's relatives, the husband's relatives instituted this action to determine heirship. In their petition the husband's relatives not only averred that the properties involved were the sole and separate property of Richard, and thus by necessary implication had not come to him from his predeceased wife under any of the circumstances set forth in section 228 of the Probate Code, but in proper form pleaded the 1934 quiet title decree as a conclusive determination of that fact and as a bar to the claims of the wife's relatives. At the inception of the trial the husband's relatives moved for judgment on the pleadings on the ground that the quiet title decree "was a bar and an estoppel" against the claims of the wife's relatives. This motion was denied by the trial court and, after trial, in its conclusions of law, the court found that "it is not true" that the wife's relatives "are estopped or barred" by the quiet title decree.

In our opinion this determination of the trial court was erroneous.

■ It is true that if the properties had gone through some special proceedings in the probate of Edna's estate, and had vested in Richard as the surviving spouse in such proceedings, heirs of Edna who were not parties to such proceedings would not have been bound by any determination there made by the probate court as to the nature of the property. (See *King* v. *Pauly,* 159 Cal. 549 [115 P. 210, Ann.Cas. 1912C 1244].) That is so because the heirs of Edna would not have been represented in such special proceeding. (*McPike* v. *Mehrmann,* 18 Cal.App. 501 [123 P. 549].) But here Richard tried his claim against his wife's estate in a quiet title action, which is a proper procedure. (*Estate of Kurt,* 83 Cal.App.2d 681 [189 P.2d 528].)

■ In this quiet title action all of the heirs of Edna were, of course, represented through the administrator of her estate. For that reason, this quiet title decree is necessarily binding not only against the administrator of Edna's estate against whom it was rendered, but also against Edna's heirs or privies. (*Luckhardt* v. *Mooradian,* 92 Cal.App.2d 501 [207 P.2d 579]; *Schwarz* v. *Bohle,* 47 Cal.App. 445 [190 P. 819]; *Estate of Clark,* 190 Cal. 354 [212 P. 622].)

Respondents, the wife's relatives, tacitly concede that the quiet title decree is res judicata against those who were heirs of the wife in 1934, that is, that that decree is binding against Edna's estate and heirs and constitutes as against such heirs a conclusive determination that the two pieces of property were the separate property of Richard. But, they urge, under section 228 of the Probate Code, they, as surviving relatives of the wife, take, if they take at all, not as heirs of the predeceased Edna, but as the statutory heirs of Richard. Respondents are correct in this portion of their argument.

■ Under section 228 of the Probate Code the relatives of the predeceased wife are made the statutory heirs of the subsequently deceased husband. The wife's relatives do not claim through the predeceased wife or through her administrator, but rely on Edna only to establish that kinship which can be translated into legal effect by making them statutory heirs of the subsequently dying Richard. (*Estate of Marshall,* 42 Cal.App. 683 [184 P. 43]; *Estate of Watts,* 179 Cal. 20 [175 P. 415]; *Estate of Perkins,* 21 Cal.2d 561 [134 P.2d 231].)

■ The wife's relatives next contend that as statutory

heirs of Richard they are not bound by the 1934 decree because they had no legal right to appear in that action, for the reason that their interest did not arise until the death of Richard in 1952, intestate.

The fallacy of this argument is that the 1934 quiet title decree bound not only the administrator of Edna's estate, but it also bound Richard. It not only bound Richard, but bound all those who were then or should become privy to him. Richard's statutory heirs, not ascertained until 1952, must be considered as being in privy with Richard, and therefore bound by the 1934 decree. ■ "A privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase. [Citing authorities.]" (*Bernhard* v. *Bank of America*, 19 Cal.2d 807, 811 [122 P.2d 892]; see also *Dillard* v. *McKnight*, 34 Cal.2d 209, 215 [209 P.2d 387, 11 A.L.R.2d 835].) It is also stated in the Bernhard case (p. 811): "The estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him. [Citing authorities.]" ■ Certainly, if the court in the 1934 quiet title action had found the property was the community property of the parties, or the separate property of Edna, Richard would have been bound by such a decree. That being so, the wife's relatives, as his statutory heirs, and therefore his privies, are also bound. It, therefore, follows that whether the wife's relatives be considered heirs of the predeceased wife or of the subsequently deceased husband they are bound by the 1934 decree.

This still leaves undecided the questions in reference to the furnishings, which were not involved in the 1934 decree. As to when these furnishings were acquired, and from what source, the record is silent. There is evidence that the home of the parties during their married life was well furnished. There is evidence that both Edna and Richard had separate property of their own. There is evidence that they accumulated some funds after marriage from their earnings. If these furnishings were acquired during the marriage of the parties, the presumption would be that they were community property. (Civ. Code, § 164.) ■ If they were acquired by Richard after the death of Edna, the presumption would be that they were his separate property. ■ It is the general rule that "where the right of a person as heir depends not merely upon the fact of a certain relationship, but upon

the fact of such relationship plus the fact that the property he claims as heir had formerly been either the community property of the decedent and his or her predeceased spouse or else the separate property of the latter, the burden of proof of showing such additional fact rests upon him. It is a fact which must appear in order that he be an heir, and he is an heir only as to property as to which it does appear.'' (*Estate of Simonton,* 183 Cal. 53, 60 [190 P. 442]; see also *Estate of Rattray,* 13 Cal.2d 702 [91 P.2d 1042].) ▮ Even though the husband's relatives filed this petition to establish heirship, they established a prima facie case when they proved that the furnishings in question were in Richard's estate at the time of death, that Richard was then unmarried, and died intestate without issue or parents surviving. The burden rested on the wife's relatives to prove that this property had been the community property of Richard and his predeceased spouse. This burden they did not sustain.

It follows that the two pieces of real property, as a matter of law, must, by reason of the 1934 decree, be declared to be the separate property of Richard. These properties should be distributed to Richard's relatives. As to the furnishings, found to be community property, the evidence in the present record is insufficient to support the finding. Unless the wife's relatives can produce additional evidence on a retrial of this issue, this property, too, should be distributed to Richard's relatives.

The portions of the judgment appealed from are reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 16, 1954, and respondents' petition for a hearing by the Supreme Court was denied August 10, 1954.